# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| § | |
| § | |
| **WSOU INVESTMENTS, LLC d/b/a,** § | |
| **BRAZOS LICENSING AND** § | |
| **DEVELOPMENT** § | **Civil Case No. 6:20-cv-00572-ADA** |
| § | **Civil Case No. 6:20-cv-00581-ADA** |
| *Plaintiff,* § | **Civil Case No. 6:20-cv-00582-ADA** |
| **v.** § | |
| § | **JURY TRIAL DEMANDED** |
| **GOOGLE LLC,** § | |
| § | |
| *Defendant.* § | |
| § | |

## GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

Page

I.    U.S. Patent No. 7,304,563 (Case No. 6:20-cv-00581-ADA)............................................. 1

    A.    "Alert" (claims 1, 12, 16)........................................................................................ 1

    B.    "initiating [a/the] connection to the other communication terminal at a predetermined time offset from [signaling the user using the signaling unit/locally signaling the users/signaling the user by the signaling means]" (claims 1, 12, 16) ...................................................................................... 2

    C.    "the terminal" (claim 12) ........................................................................................ 3

    D.    "issuing means for issuing an alert" (Claim 16) .................................................... 6

    E.    "alerting unit configured to issue an alert" and "signaling unit configured to locally signal to a user" (claim 1) ...................................................................... 7

II.   U.S. Patent No. 8,041,806 (Case No. 6:20-cv-00572-ADA) ......................................... 8

    A.    "communication traffic exchanged with a communication network subscriber over an access communication link" (claims 1, 9, 10, 11, 14)............ 8

    B.    "access network" (claims 1, 7, 9, 10, 11, 14)....................................................... 11

    C.    "a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link" (claims 1, 9, 10) ...................................................... 12

    D.    "the behavioral information collector being configurable to collect from any of a plurality of types of communication traffic in the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link" / ......................................... 12

    "the behavioral information collector operable to . . . collect from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link" / ......................................... 13

III.  U.S. Patent No. 8,238,861 (Case No. 6:20-cv-00582-ADA)........................................ 15

## TABLE OF AUTHORITIES

Page

CASES

*Bd. of Regents of the Univ. of Tex. v. BENQ Am. Corp.*,
    533 F.3d 1362 (Fed. Cir. 2008)................................................................................1

*Biomedino, LLC v. Waters Techs. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007)................................................................................6

*CXT Sys., Inc. v. Academy, Ltd.*,
    2019 WL 4253841 (E.D. Tex. 2019)......................................................................14

*Diebold Nixdorf, Inc. v. ITC*,
    899 F.3d 1291 (Fed. Cir. 2018)........................................................................8, 13

*Egenera, Inc. v. Cisco Sys., Inc.*,
    972 F.3d 1367 (Fed. Cir. 2020)........................................................................8, 14

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012)............................................................................15

*Fenner Inv., Ltd. v. Cellco P'ship*,
    778 F.3d 1320 (Fed. Cir. 2015)..............................................................................2

*Helmsderfer v. Bobrick Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)..............................................................................1

*Kraft Foods, Inc. v. Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000)..............................................................................9

*Media Rts. Techs., Inc. v. Capital One Fin. Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015)............................................................................14

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)..............................................................................7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)..............................................................................2

*Pickholtz v. Rainbow Techs., Inc.*,
    284 F.3d 1365 (Fed. Cir. 2002)..............................................................................7

*Rain Comp., Inc. v. Samsung Elecs. Am., Inc.*,
    2021 WL 786361 (Fed. Cir. 2021)........................................................................15

*Toro Co. v. White Consol. Indus., Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999)..............................................................................9

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| Exs. 1–13 | As filed in Google's Responsive Claim Construction Brief (Dkt. 34) |
| Ex. 14 | 2006-08-16 Applicant Arguments/Remarks Made in an Amendment |
| Ex. 15 | 2007-05-03 Applicant Arguments/Remarks Made in an Amendment |

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| WSOU | Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development |
| Google | Defendant Google LLC |
| '563 patent | U.S. Patent No. 7,304,563 |
| '806 patent | U.S. Patent No. 8,041,806 |
| '681 patent | U.S. Patent No. 8,238,681 |
| Group 4 Patents | Collectively, U.S. Patent Nos. 7,304,563; 8,041,806; and 8,238,681 |
| AF | Autofocus |
| DPI | Deep Packet Inspection |
| IPTV | Internet Protocol Television |
| ISP | Internet Service Provider |
| POSITA | Person Of Ordinary Skill In The Art |

*\* Emphasis added unless indicated otherwise.*

*\*\* For the Court's convenience, Google cites to WSOU's opening brief by referring to the brief filed in Case No. 6:20-cv-00572-ADA (which is the same for all of the above-captioned cases) and to the pagination generated by CM/ECF (at the top of the page) rather than the pagination at the bottom of the page.*

I.      **U.S. Patent No. 7,304,563 (Case No. 6:20-cv-00581-ADA)**

A.      **"Alert" (claims 1, 12, 16)**

A cardinal rule of claim construction is that "different claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Equip., Inc*., 527 F.3d 1379, 1382 (Fed. Cir. 2008). Here, the applicant deliberately chose to use the words "alert" and "signal" separately and distinctly, thereby requiring the two terms to have different meanings. (Dkt. 34 at 9-10.) Ignoring this rule, WSOU argues that "alert" and "signal" mean the same thing but delineate events on distinct devices. WSOU's position is unsupported by the intrinsic evidence.

As Google's brief explains, the '563 patent describes a litany of instructions that may be associated with two exemplary "alarms"—the first "signaled locally at the phone" and the second "generated by means of a call to another phone"—including instructions about when and on which device(s) signal(s) are to occur. (*Id.* at 10.) Reading the entirety of the intrinsic evidence, a POSITA would understand that issuing an "alert" is the "instructions causing a communication terminal to perform an action," as the '563 patent describes for the two "alarms." To obscure this straightforward analysis, WSOU raises two unsustainable arguments.

<u>First</u>, WSOU attempts to assign all references to "alert" to the "mobile communication terminal" (terminal A), and all references to "signal" to the "another communication terminal" (terminal B), but WSOU's approach leads to absurd results. (Dkt. 36 at 4.) WSOU argues that claim 1 recites an "alerting unit" that comprises a "signaling unit," such that the signaling unit is physically part of the alerting unit. (Dkt. 36 at 4.) If, as WSOU contends, "alert" and "signal" are terms reserved only for their respective terminals, then the physical structure of the "alerting unit" becomes an impossibility because it must be in terminal A, but the "signaling unit" must be in terminal B. Courts "decline to adopt a construction that would effect this nonsensical result." *Bd. of Regents of the Univ. of Tex. v. BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed. Cir. 2008).

<u>Second</u>, WSOU attempts to separate "alert" from the instructions causing the mobile communication terminal to perform an action by asserting that the specification's referenced "alarm" is not the same as the claimed "alert." (Dkt. 36 at 4–5.) Yet all references to "alert" in

the specification are nearly verbatim recitations of the claim language without further elaboration.  (Ex. 1 at Abstract, 1:49–2:28.)  An "alarm," and its associated instructions, is the only embodiment that is described, and it is labeled the "preferred embodiment."  (*Id.* at 3:4–10.) Yet WSOU argues that the exemplary embodiments disclose alarms *but not alerts*.  (Dkt. 36 at 4–5.)  If that were so, then the claimed "alerts" are not enabled nor supported by written description.

The patentee acted as a lexicographer by choosing to use the term "alert"—a word with multiple plain and ordinary meanings—separate and apart from the term "signal" in the claims. Because a "plain and ordinary" construction does not resolve the parties' dispute, the Court must construe "alert."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1362 (Fed. Cir. 2008).  A POSITA would understand that—much like an AMBER alert—an "alert" as used in the claims  is the "instructions causing a communication terminal to perform an action."

**B.**      **"initiating [a/the] connection to the other communication terminal at a predetermined time offset from [signaling the user using the signaling unit/locally signaling the users/signaling the user by the signaling means]" (claims 1, 12, 16)**

"The foundation of judicial claim construction is the 'written description' in the specification."  *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015).  As WSOU's arguments confirm, construction of this phrase is necessary to define the boundaries between what the patentee disclosed and what he did not.  The patentee disclosed (1) initiating a connection that facilitates direct communication (2) to a predefined communication terminal (3) at a time set apart by a predefined interval from a local signal.  (Dkt. 34 at 11-14.)

First, the '563 patent discloses only direct communication between terminals A and B. (Dkt. 34 at 12.)  Given the absence of any disclosure of indirect communications, WSOU mischaracterizes Google's arguments.  (Dkt. 36 at 7-9.)  WSOU states that Google admits that indirect connections are covered by the claims (*id.* at 8); however, Google stated only that it was not arguing that a phone call was the *only* covered embodiment.  (Dkt. 34 at 12.)  WSOU also argues against construing "connection" as "direct *connection*," but Google's construction is "a link that allows direct *communication* between" terminals A and B.  Under Google's

construction, the connection may well pass through a cellular tower or similar device, but it must facilitate direct communication between the two terminals.[1]  This is the proper scope, because the '563 patent never discloses a connection that facilitates only indirect communication between two terminals that are each only in direct communication with an intermediary device, such as a server.[2]

Second, WSOU fails to identify any disclosed method for initiating a connection from terminal A to another terminal that the user has not defined in advance.  WSOU argues that the connections disclosed in the '563 patent are not made to a predefined terminal because selecting a phone number is not the same thing as selecting the physical terminal.  (Dkt. 36 at 8.)  Phone numbers, however, are assigned to physical terminals and selecting a phone number defines which terminal (or terminals if it is a landline) will be connected to terminal A.  Whether selecting a physical terminal or the address of that terminal, the '563 patent discloses initiating a connection only to predefined destinations.

Finally, regarding "predetermined time offset," WSOU does not dispute the substance of Google's construction.  Indeed, WSOU argues that Google's construction is the term's ordinary meaning.  (Dkt. 36 at 9-10.)  Accordingly, Google agrees that this portion of the claim phrase can be given its ordinary meaning.

### C.    "the terminal" (claim 12)

Claim 12 expressly recites a "mobile communication terminal" and "another communication terminal."  Then, claim 12 twice recites "the terminal" without clear antecedent

---

[1] WSOU points to dependent claim 3 reciting a "wireless" connection as supporting its indirect communication theory.  (Dkt. 36 at 8.)  But a wireless connection is not an indirect communication facilitated by multiple, uniquely-initiated connections.  Rather, devices such as the network connected hi-fi system (Ex. 1 at 5:25-26), or other devices connected over, *e.g.*, a Bluetooth network, could be in direct communication over a wireless network.

[2] WSOU points to text messaging, which it states is facilitated by a server that receives, stores, and then forwards text messages.  (Dkt. 36 at 8.)  However, the '563 patent neither discloses nor claims text messaging, and the mechanism by which text messages are transmitted is therefore irrelevant to the construction of this term.

basis.  (Ex. 1 at 6:46-47, 6:49-50.)  In both instances, "the terminal" fails to provide reasonable certainty of claim scope because it is just as likely that it refers to terminal A as to terminal B. (Dkt. 34 at 14-16.)  WSOU's reply repeats its opening arguments verbatim, relying on the proximity of the reference to "another communication terminal" to the first instance of "the terminal."  (Dkt. 36 at 9-10.)  The proximity of two terms does not, however, support any conclusion about their relationship.  Context is just as, if not more, important than proximity, and claim 12 does not provide sufficient context to determine whether either instance of "the terminal" refers to terminal A or terminal B.[3]

WSOU repeats its assertion that in both instances "the terminal" can refer *only* to terminal B, arguing that each "local signal" *must* occur on terminal B.  (Dkt. 36 at 9-10.)  WSOU is wrong for multiple reasons.  First, WSOU ignores the intrinsic evidence and the context that could inform a POSITA as to which communications terminal "the terminal" refers, shrugging off explicitly disclosed embodiments discussed by Google as "hypotheticals."  (Dkt. 36 at 10.) Based on the specification's disclosure that the "another communication terminal" (terminal B) is not necessarily local to the user, the claim's use of "that other terminal" to refer to terminal B (Ex. 1 at 6:43-44), and the lack of clear antecedent basis for "the terminal," it is at least as likely that "the terminal locally signaling to the user" refers to the mobile communication terminal (terminal A) instead.  (Dkt. 34 at 15.)  This lack of clarity renders "the terminal" indefinite.

Second, interpreting "the terminal" as WSOU proposes leads to nonsensical results and excludes the preferred embodiment.  As shown in Google's brief, a plain reading of the "predetermined time offset" limitation suggests that "the other terminal" (terminal B) is not the one "locally signaling"; terminal A is.  (Dkt. 34 at 15.)  Under WSOU's interpretation, however,

---

[3] As an example, take the sentence "Competitor A told Competitor B that its technology was innovative."  "Its technology" as used in that sentence could refer to Competitor A's technology or to Competitor B's technology.  While "its technology" is nearer to Competitor B than Competitor A, it is equally, if not more, likely that the drafter of the sentence meant that Competitor A told Competitor B that Competitor A's technology was innovative.  Additional context would be necessary to draw a definitive conclusion.  So too here.

terminal A would initiate a connection to terminal B, causing terminal B to locally signal the incidence of that connection, at a predetermined time offset from terminal B locally signaling to the user—which makes no sense.  Attempting to explain away this ambiguity, WSOU argues that this limitation, like the preferred embodiment, provides that "the user is disturbed separately" by two alarms.  (Dkt. 36 at 10.)  The preferred embodiment, however, requires that the first alarm "be signaled locally at the phone [terminal A]" and the second alarm "be generated by means of a call to another phone [terminal B]."  (Ex. 1 at 4:4-12.)  The preferred embodiment involves a local signal on both terminals A and B, which WSOU's construction actually excludes.

Third, WSOU's construction improperly recaptures disclaimed subject matter.  During prosecution, the Examiner rejected all of the independent claims in view of U.S. Patent No. 6,940,395 to Steinmark.  In response, the applicant argued that"[t]here is no disclosure in Steinmark of an alert unit, which is **both** capable of **producing a local signal itself** via a signaling unit and also **connecting over a network to a further communication terminal** to cause that terminal to also activate an alarm signal."  (Ex. 14 (2006-08-16 Applicant Arguments/Remarks Made in an Amendment) at 10.)[4]  If WSOU is correct that every claimed local signal occurs on terminal B and both instances of "the terminal" indeed refer to terminal B, claim 12 would extend to expressly disclaimed embodiments because no local signal would occur on terminal A.

In order to construe claim 12 without excluding the preferred embodiment in which both terminals A and B locally signal at different times, at least one instance of "the terminal" must refer to terminal A.  But claim 12 does not provide any guidance for a POSITA to determine which one that is—or if it is both.  This type of guessing game resulting from two recitations of

---

[4] Responding to  a second rejection, applicant again emphasized that the claimed invention "allow[ed] the alarm clock to not only sound an alarm from a loud speaker, for example in a mobile phone, but also to call a predetermined telephone number, such as a home telephone number of the user."  (Ex. 15 (2007-05-03 Applicant Arguments/Remarks Made in an Amendment) at 12.)

"the terminal" that lack antecedent basis is exactly what the definiteness requirement serves to prevent.

### D.    "issuing means for issuing an alert" (Claim 16)

There is no dispute that the structure for "issuing means" must be more than the agreed structure for "signaling means."  The "issuing means" performs the additional functions of "*initiating a connection to* another communication terminal" and "*causing* the signaling means to" perform its function of "locally signal[ing] to the user."  (Ex. 1 at 7:1–10.)  WSOU fails to cite *any* structure that is tied to either of these claimed functions.  Rather, WSOU's citations refer to a general-purpose computer, which is insufficient.[5]  (Dkt. 34 at 17-18.)

Recognizing the absence of any corresponding structure, WSOU's reply cites (for the first time) "another exemplary embodiment" in which the mobile phone operates in accordance with a "suitable communications protocol" such as GSM or 3G.  (Dkt. 36 at 11 (citing Ex. 1 at 3:45–47).)  WSOU argues that there is sufficient structure because connection over a network and an appropriate algorithm to do so, would have been well known in the art.  (*Id.*)  But, a "bare statement that known techniques or methods can be used does not disclose structure." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007).  "The inquiry is whether [a POSITA] would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure."  *Id.*  Thus, WSOU's suggestion that a POSITA would be capable of implementing a structure to initiate a connection between terminals fails as a matter of law to show that the '563 patent discloses adequate structure for "issuing means for issuing an alert."  Moreover, WSOU's alleged algorithm does not support the function of "causing the signaling unit to locally signal," and "where a disclosed

---

[5] WSOU mischaracterizes Google's position as arguing "that 'issuing means' does not perform the same function of 'locally signaling to the user.'"  (Dkt. 36 at 8).  To the contrary, Google agrees that the issuing means must comprise the signaling means, which must in turn locally signal to the user.  Nor is there any dispute that the same structure may be capable of performing multiple functions.  (*Id.*)  The question is whether the '563 patent discloses sufficient structure to perform the *additional* functions that the claim language ascribes to the "issuing means."  It does not.

algorithm supports some, but not all, of the functions associated with a means-plus-function limitation, [courts] *treat the specification as if no algorithm has been disclosed at all*."  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012).

**E.    "alerting unit configured to issue an alert" and "signaling unit configured to locally signal to a user" (claim 1)**

Google's brief establishes that these terms should be construed in the same manner as their agreed means-plus-function counterparts in claim 16.  (Dkt. 34 at 18-21.)  A patentee may not insulate a claim from § 112, ¶ 6  by substituting a nonce word (*e.g.*, "unit") for the term "means," as the patentee did here.  The Federal Circuit makes clear that appending a functional adjective does not supply sufficient structure to overcome means-plus-function treatment.  (Dkt. 34 at 18-21).

Here, the intrinsic evidence rebuts the presumption from the absence of the word "means" because it: (1) uses the term "unit" interchangeably with "means" in a classic means-plus-function format; and (2) adds purely functional adjectives ("alerting" and "signaling") that do not provide any structure.  WSOU's "claim differentiation" argument is meritless.  (Dkt. 36 at 6.)  "[T]he patent in this case provides no indication that the two terms mean different things … nothing in the patent itself explicates their relationship or indicates any difference in meaning." *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002).  Just the opposite— during prosecution, the applicant made identical arguments concerning the patentability of claim 1 and claim 16 (claim 19 during prosecution).  To overcome a prior-art rejection applied to both claims, the patentee referred to both as having an "alerting unit that is configured to issue the alert."  (Ex. 14 (2006-08-16 Applicant Arguments/Remarks Made in an Amendment) at 10–11.) The intrinsic evidence never indicates that "unit" is anything more than a substitute for "means."

Tellingly, WSOU never addresses the Federal Circuit's clear guidance regarding the substitution of nonce terms for the word "means."  (Dkt. 34 at 19-20.)  Nor does WSOU attempt to distinguish numerous district court cases that, in line with Federal Circuit authority, reject the use of purely functional language as a sufficient identification of structure.  (*Id.*)  WSOU only

addresses *Dyfan*, and its attempt to distinguish that case based on the use of expert testimony is meritless.  (Dkt. 36 at 6.)  This Court did not indicate that expert testimony drove *Dyfan*'s holding.   In any event, there is no requirement that a court must rely on expert testimony.[6]  As the Federal Circuit instructs, "none of our cases mandate that a party seeking to overcome the presumption against application of § 112, ¶ 6 can only do so by presenting extrinsic evidence that [a POSITA] would fail to understand that a term connotes a definite structure.  Imposing such a requirement would be inconsistent with the Supreme Court's guidance."  *Diebold Nixdorf, Inc. v. ITC*, 899 F.3d 1291, 1299 (Fed. Cir. 2018).  Indeed, "[t]o determine whether the claim limitation at issue connotes sufficiently definite structure to a [POSITA], *we look first to intrinsic evidence, and then, if necessary*, to the extrinsic evidence."  *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1373 (Fed. Cir. 2020).

Mere substitution of "unit" for "means" cannot exempt "alerting unit" and "signaling unit" from § 112, ¶ 6.  "Signaling unit" has the same structure and function as "signaling means." "Alerting unit" has the same function as "means for issuing an alert."  Because the '563 patent fails to disclose sufficient structure for "means for issuing an alert," it fails to do so for "alerting unit."

## II.    U.S. Patent No. 8,041,806 (Case No. 6:20-cv-00572-ADA)

### A.      "communication traffic exchanged with a communication network subscriber over an access communication link" (claims 1, 9, 10, 11, 14)

The parties agree that (1) "communication traffic" is information that traverses a network link (*i.e.*, information that is in transit), (2) all the independent claims recite "provid[ing] an Internet Protocol Television (IPTV) service," which requires transmission of packet data, and (3) packet data is digital information.  (Dkt. 34 at 22-24.)  The dispute is limited to the scope of

---

[6] WSOU also argues that *Dyfan* is inapposite because "the issue was regarding 'mobile device' as structure for 'code.'"  (Dkt. 36 at 6.)  But the precise function that a "mobile device" performs does not make it any more or less a sufficient disclosure of structure.  Here, the specification's disclosure of a "mobile phone compris[ing] a central processor unit" or "processor" does not connote a known structure for the claimed "alerting unit" or "signaling unit."  (Ex. 1 at 3:21, 3:58-67, 4:18-20.)

"communication traffic" and the location of the "access communication link."[7]  WSOU asserts that Google improperly limits "communication traffic" to digital information and the "access communication link" to a link between the subscriber and the access network.  The intrinsic record, however, establishes that Google's construction is correct for multiple reasons.

First, with respect to the "scope" dispute, claim differentiation does not preclude Google's construction that the communication traffic is information in digital form.  (Dkt. 36 at 12.)  As an initial matter, courts "decline[] to apply … claim differentiation where 'the claims are not otherwise identical in scope.'" *Apple, Inc. v. Amernath Inc*., 842 F.3d 1229, 1238 (Fed. Cir. 2016).  Here, claim 3 is not simply differentiated by its recitation of "packet traffic."  Rather, claim 3 further limits claim 1 by requiring a "Deep Packet Inspection (DPI) module" that monitors the communication traffic.  (Ex. 2 at claim 3.)  Given that claim 3 is narrower than claim 1, Google's construction does not render claim 3 redundant, and presents no claim differentiation problem.  Moreover, "claim differentiation only creates a presumption that each claim in a patent has a different scope; it is 'not a hard and fast rule of construction.'" *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (holding that presumption from claim differentiation was overcome by the written description and prosecution history).  Importantly, claim differentiation "does not override clear statements of scope in the specification…" *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999).  Here, any presumption is overcome by the specification, which limits the scope of communication traffic to packet traffic (a type of digital information ) and confirms that the communication traffic consists of digital information.  (Ex. 2 at 1:24-39 (discussing transmission of "digital advertisements" to users in prior art), 2:1-17 (discussing transmission of "packets" in prior art), 2:66-3:3, 6:32-42.)

---

[7] WSOU contends that Google's assessment of the prosecution history provides no basis for a disclaimer. (Dkt. 36 at 13-14.)  WSOU's argument fails because the applicant distinguished the prior art's tracking of user actions through a specific Web server (*i.e*, recording user actions on the Web server) with monitoring and collecting communication traffic as claimed.  (Dkt. 34-3 at 9-11.)

Second, with respect to "scope," the specification supports construing "communication traffic" as requiring digital information.  As discussed above, the only form of communication traffic that the specification describes as being monitored is packet data (digital information). WSOU erroneously equates the *types* of communication traffic sent over the access communication link with the *form* of the traffic sent over that link.  The types of traffic (*i.e.* content) that can be transmitted over the link includes, for example: email, URL, search phrases, and application signatures.  (Dkt. 34 at 22; Ex. 2 at 9:19-24, 15:38-45.)  The data in each of these types of traffic are transmitted as packets—*i.e.*, in digital form.  (Dkt. 34 at 22.)  The communication traffic includes the digital information provided by the IPTV service recited in each independent claim.  WSOU does not dispute that an IPTV service requires transmission of packet data (digital information).  Contrary to WSOU's argument, the claims and specification show that the IPTV service is provided to the subscriber.  (Dkt. 36 at 13.)  Specifically, the access network includes an electronic content source for delivery of electronic content to a subscriber, and the IPTV service is a type of electronic content that is provided to the subscriber. (Ex. 2 at 3:20-25, 5:11-23, 7:39-49, claims 1, 9-11, 14, Figs. 1-2.)

Third, with respect to the "location" dispute, the record is clear that the access communication link connects the subscriber and the access network.  A central purpose of the invention is providing subscribers with access to electronic content (sourced by or through the access network) over the access communication link, and to monitor the information flow across that link.  (Ex. 2 at Abstract, Figs. 1-3 (and related discussion), 1:7-10, 3:20-25, 4:3-25, 5:11-16, 7:61- 8:3.)  This confirms that the access communication link must exist between the subscriber and the access network—it connects them.  Further, as discussed in Google's brief, the only disclosed location of an access communication link is between the subscriber and the access network.  (Dkt. 34 at 22-24; Ex. 2 at Fig. 2.)  WSOU wrongly contends that Figures 1 and 2 are counterexamples that undercut Google's argument.  (Dkt. 36 at 14-15.)  Figure 2, which is the only figure showing a labeled access communication link, is simply a more detailed version of Figure 1.  (Ex. 2 at Figs. 1-2, 4:35-38, 5:30-35.)  Thus, even though the access communication

link is not labeled in Figure 1, it corresponds logically to the line connecting the subscribers (12, 14) to the access communication network (16) (access network) in Figure 1, just like the link (26) connects the subscriber (22) and the access network (24) in Figure 2.

WSOU also incorrectly asserts that Google's construction excludes the possibility that the access communication link be "in" the access network.  (Dkt. 36 at 14-15.)  Rather, the intrinsic record shows that the access communication link is both *connected* to, and *in*, the access network.  Figure 2 shows that the access communication link (26) connects the subscriber (22) and the access network (24).  (Ex. 2 at Fig. 2.)  The access communication link (26) is "*between*" these two points because it connects them, and it can connect them while also being part of or *"in"* the access network.  (*Id.* (showing access communication link (26) extending into the access network (24) to connect to behavioral information collector (28); *see id.* at 5:44-47 ("A behavioral information collector may be deployed ***'inline' in the access communication link 26 at the access side or network side of the SME 30***, as shown at 28 and 32, respectively.").)  Moreover, the claim language focuses on the "***exchange***" of communication traffic with a subscriber "***over*** an access communication link."  (Ex. 2 at claim 1.)  Google's construction simply identifies the path that the communication traffic must take during that exchange—a network link between the subscriber and the access network.

### B.      "access network" (claims 1, 7, 9, 10, 11, 14)

The parties dispute whether the access network must connect a subscriber to its ISP. Google's opening brief establishes that it must, and WSOU's reply fails to show otherwise.

First, Google construes "access network" in terms of what it is (a network connecting a subscriber to its ISP), not, as WSOU contends, "what access" it provides or "where" it provides the access.  (Dkt. 36 at 15.)  WSOU, on the other hand, seeks no construction in an attempt to broaden "access network" to simply a "network."  An access network, according to the specification and the extrinsic evidence, is not simply any network, rather, it is a particular type of network that connects a subscriber to its ISP.  The patentee chose to claim a specific "access network," and the claim must be construed as such.  WSOU's criticism of Google's reliance on

IPTV-related disclosures misinterprets the intrinsic record.  (Dkt. 36 at 15.)  As explained above, an IPTV service is a type of content provided by the ISP *to its subscribers* via the access network.  (Ex. 2 at 3:20-25, 5:11-23, 7:39-49, Figs. 1-2.)

Second, WSOU erroneously characterizes Google's discussion of the intrinsic record as internally inconsistent.  (Dkt. 36 at 15-16.)  WSOU's argument and its flow diagrams that purport to represent Google's argument misunderstand the specification and Google's arguments.  (Dkt. 34 at 22-24.)  WSOU's diagrams mischaracterize the relationship between the ISP, access network, and IPTV service by ignoring the specification's disclosure that the ISP can both implement the access network and provide the IPTV service.  Figure 1 and its accompanying description disclose that the ISP implements network equipment *as the access communication network 16 to provide subscribers with access to the Internet*.  (Ex. 2 at Fig. 1, 5:11-16.)  Figure 1 also discloses a connection between the subscribers (12, 14) and the access communication network (16)—a connection between the subscribers and their *Internet* Service Provider (ISP)—and the patent further discloses that the ISP provides an *IPTV service within the access communication network 16*.  (*Id.* at 5:17-23.)  Similarly, Figure 2 and its accompanying description disclose that the ISP can host its own IPTV service (as an electronic content source) within the access network.  (*Id.* at 7:39-44.)  Figures 1 and 2 both support Google's position that the subscriber must connect to its ISP via the access network in order to access the Internet and the IPTV services offered by the ISP.

**C.     "a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link" (claims 1, 9, 10)**

**D.     "the behavioral information collector being configurable to collect from any of a plurality of types of communication traffic in the monitored communication traffic**

**behavioral information indicative of behavior of the subscriber in using the access communication link"** /

**"the behavioral information collector operable to . . . collect from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link"** /

**"the behavioral information collector being configurable to collect the behavioral information from any of a plurality of types of communication traffic in the monitored communication traffic" (claims 1, 9, 10)**

Google's brief establishes that these terms are subject to Section 112, ¶ 6 and indefinite for failure to disclose structure sufficient to perform the claimed functions.  WSOU's reply fails to disturb those showings.  (Dkt. 34 at 27-30.)

First, WSOU erroneously contends that Google (1) fails to establish that "collector" is a nonce term, (2) shifts the burden on WSOU to show that a POSITA would have understood the term as connoting structure, and (3) ignores unrelated cases where analogous "collector" terms were held not indefinite.  WSOU is wrong on all counts.  The Federal Circuit rejects WSOU's contention that expert testimony is necessary to show that a general term such as "collector" is a nonce term.  *See Diebold*, 899 F.3d at 1299.  "[I]n appropriate cases, a party advocating that a claim limitation that does not recite the word 'means' is subject to § 112, ¶ 6 can overcome the presumption against its application solely by reference to evidence intrinsic to the patent."  *Id.* at 1299-1300.  This is one of those cases.  (Dkt. 34 at 27-30.)  Contrary to WSOU's assertion, Google does not shift any burdens to WSOU. (*Id.* at 29.)  Rather, it identifies the complete absence of intrinsic and extrinsic evidence supporting the assertion that "behavioral information collector" connotes a specific structure.  WSOU's reply similarly falls short, providing no support aside from attorney argument and inapposite cases.  (Dkt. 36 at 17-18.)  Notably, WSOU fails to address the specification's express statement that "[g]iven the broad range of possible implementations of many of the components of the system 20, these components are described herein primarily in terms of their functions."  As Google established, the "behavioral information collector" is precisely one such component.  (Dkt. 34 at 29.)

Contrary to WSOU's assertion, the alleged failure of parties to apply Section 112, ¶ 6 in unrelated cases does not confer structure on the "behavioral information collector" or insulate the disputed terms from indefiniteness.  Further, Google properly dispatched WSOU's cases related to allegedly "analogous collector terms" because they were inapposite and did not involve any Section 112, ¶ 6 issues. (Dkt. 34 at 29.)  For example, *CXT Sys., Inc. v. Academy, Ltd.*, which WSOU cites in its briefs, is inapplicable because no "collector" terms were at issue.  *CXT Sys., Inc. v. Academy, Ltd.*, 2019 WL 4253841, at *11 (E.D. Tex. 2019).

Second, the record does not support WSOU's argument that the "connection" and "interaction" between the behavioral information collector and other claimed components preclude indefiniteness.  (Dkt. 36 at 17-18.)  The patent describes the behavioral information collector in purely functional terms.  (Dkt. 34 at 28-30.)  WSOU tries—and fails—to cure this lack of structure by relying on language in claim 1 that says nothing about the structure of the behavioral information collector.  (Dkt. 36 at 17-18.)  Instead, the claim language on which WSOU relies (1) describes the behavioral information collector in terms of its functions (*i.e.* "monitor" and "collect"), (2) states what the behavioral information collector is coupled to, and (3) states generally that the behavioral information can be "hardware" which is nothing more than a black box description.  Such language is insufficient to confer sufficient structure on the behavioral information collector.  (Dkt. 34 at 27-30.)  "The question is not whether a claim term recites any structure but whether it recites sufficient structure—a claim term is subject to § 112(f) if it recites function without reciting sufficient structure for performing that function." *Egenera*, 972 F.3d at 1374.  Indeed, the Federal Circuit rejects arguments like WSOU's:

> [T]he claim does not describe how the "distributed learning control module" interacts with other components … in a way that might inform the structural character of the limitation-in-question or otherwise impart structure.

*Williamson v. Citrix Online*, 792 F.3d 1339, 1351 (Fed. Cir. 2015); *Media Rts. Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015) (§ 112, ¶ 6 applies when patent

"only describes the term's function and interaction with other parts in the system" because "[t]his disclosure fails to provide sufficient structure")

Third, contrary to WSOU's argument, Google has shown that the disputed term is indefinite.  (Dkt. 34 at 27-30.)  Again, expert testimony is not necessary here, where the specification and file history obviously lack sufficient structure for the behavioral information collector.  (Dkt. 34 at 28-30.)  "[I]f the patentee fails to disclose adequate corresponding structure, the claim is indefinite."  *Rain Comp., Inc. v. Samsung Elecs. Am., Inc.*, Case No. 20-1646, 1656, 2021 WL 786361, at *3 (Fed. Cir. 2021).

Moreover, WSOU's argument that a POSITA would have understood that the disputed terms connote structure is unsupported by the part of specification on which WSOU relies.  (Dkt. 36 at 18 (citing Ex. 2 at 6:29-46).)  That disclosure states generally that the behavioral information collector can be a "standalone network element," but provides no further description of that network element.  (Dkt. 34-2 at 6:29-46.)  Instead, it describes the behavioral information collector in terms of its function.  (*Id.*)  A "patentee is only entitled to 'corresponding structure ... described in the specification and equivalents thereof,' not any device capable of performing the function."  *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012).  Mere reference to a generic "standalone network element" capable of performing the behavioral information collector's functions does not preclude indefiniteness.  *See, e.g.*, *Rain Computing, Inc.*, 2021 WL 786361, at *4 (computer-readable media or storage devices provided insufficient structure because they amounted to "nothing more than a general-purpose computer" and some "special programming, *i.e.*, an algorithm, would be required").

## III.    U.S. Patent No. 8,238,861 (Case No. 6:20-cv-00582-ADA)

WSOU did not file a reply brief addressing Google's arguments or the 681 patent.  The Court should adopt Google's constructions.

Date: March 12, 2021

Respectfully submitted,

*/s/   Tharan Gregory Lanier, with permission*
*by Michael E. Jones*

Tharan Gregory Lanier (pro hac vice)
**Jones Day**
1755 Embarcadero Road
Palo Alto, California, 94303
+1 (650) 739-3939
+1 (650) 739-3900 facsimile
tglanier@jonesday.com

Michael E. Jones (Texas Bar No. 10929400)
Patrick C. Clutter (Texas Bar No. 24036374)
**Potter Minton, P.C.**
110 North College, Suite 500
Tyler, Texas, 75702
+1 (903) 597-8311
+1 (903) 593-0846 facsimile
mikejones@potterminton.com
patrickclutter@potterminton.com

Sasha Mayergoyz
**Jones Day**
77 W. Wacker Drive
Chicago, IL 60601
+1 (312) 782-3939
smayergoyz@jonesday.com

Tracy A. Stitt
Edwin O. Garcia
**Jones Day**
51 Louisiana Avenue NW
Washington, DC 20001
+1 (202) 879-3641
tastitt@jonesday.com
edwingarcia@jonesday.com

Michael A. Lavine
**Jones Day**
555 California Street
26th Floor
San Francisco, California 94104
+1 (415) 626-3939
mlavine@jonesday.com
David E. Anderson

- 16 -

**Jones Day**
325 John H. McConnell Blvd, Suite 600
Columbus, OH 43215
+1 (614) 281-3617
danderson@jonesday.com

T. Kaitlin Crowder
**Jones Day**
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
+ 1 (216) 586-3939
kcrowder@jonesday.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 12, 2021, I electronically filed this document with the Clerk of Court via the Court's CM/ECF system which will send notification of such filing to all counsel of record, all of whom have consented to electronic service in this action.

*/s/ Michael E. Jones*